THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER BUCK, individually and on behalf of all similarly situated persons, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WARNER MUSIC GROUP CORP., | |
| Defendant. | |

Plaintiff Alexander Buck ("Plaintiff" or "Mr. Buck"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Warner Music Group ("Defendant" or "WMG") and alleges, upon personal knowledge as to his own actions and the investigation of counsel, and upon information and belief as to all other matters, as follows:

## I.    INTRODUCTION

1.    Plaintiff brings this class action against WMB for its failure to properly secure and safeguard personal identifiable information, including without limitation, unencrypted names, email addresses, telephone numbers, billing addresses, shipping addresses, payment card numbers, payment card CVV security codes, and payment card expiration dates (collectively, the "PII"). Plaintiff also alleges WMG failed to provide timely, accurate, and adequate notice to Plaintiff and similarly situated WMG customers (the "Class Members") that their PII had been stolen by hackers, and precisely what types of information was unencrypted and in the possession of unknown, unauthorized third parties.

2.    WMG owns and operates some of the largest record labels in the world, and represents over 60,000 artists. In marketing its artists' music and other merchandise online, WMG operates thousands of "official" websites for many of its labels and performers. These websites

1

each include an e-commerce platform to assist fans in purchasing music and related merchandise that is operated by WMG and its agents.

3.      On or about September 2, 2020, WMG began notifying various state Attorneys General about a data breach that occurred on many of its websites between April 25, 2020 and August 5, 2020 (the "Data Breach"). Around the same time, Defendant mailed a *Notice of Data Breach* to consumers affected by the Data Breach. The notice stated that "an unauthorized third party had compromised a number of US-based e-commerce websites WMG operates," and that this Data Breach allowed the "unauthorized third party" to acquire PII that WMG customers entered into one or more of the affected websites' e-commerce platforms. WMG admitted that the "compromised" PII included full names, email addresses, telephone numbers, billing addresses, shipping addresses, payment card numbers, payment card CVV security codes, and payment card expiration dates.

4.      By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the Class Members' PII, WMG assumed legal and equitable duties to those consumers. WMG admits that the PII entered onto its websites' e-commerce platforms was "compromised" by an "unauthorized third party." The stolen information includes everything unauthorized third parties need to illegally use WMG's current and former customers' PII to steal their identities and to make fraudulent purchases.

5.      Not only can unauthorized third parties access Defendant's customers' PII, the PII can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to other criminals. As such, Plaintiff and WMG's current and former customers face a lifetime risk of identity theft.

6.     This PII was compromised due to WMG's negligent acts and omissions and its failure to protect customers' data. In addition to WMG's failure to prevent the Data Breach, Defendant failed to detect the Data Breach for almost four months.

7.     Notably, when WMG did finally discover the Data Breach, it took at least a month to report it to the affected consumers and the states' Attorneys General.

8.     Because of this delayed response, Plaintiff and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. This risk will persist.

9.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of WMG's failure to: (i) adequately protect its customers' PII; (ii) warn customers of its inadequate information security practices; and (iii) effectively monitor its websites and e-commerce platforms for security vulnerabilities and incidents. WMG's conduct amounts to negligence and violates federal and state statutes.

10.     Plaintiff and Class Members have suffered injury directly caused by WMG's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, financial crimes, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) deprivation of rights they possess under the New York Consumer Law for Deceptive Acts and Practices (New York Gen. Bus. Law § 349); and (v) the continued and certainly increased risk to their PII, which PII will remain available on the dark web for individuals to access and abuse, and which PII remains in WMG's possession and is subject to further unauthorized disclosures

so long as WMG fails to undertake appropriate and adequate measures to protect these consumers' PII.

11.    WMG disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that its customers' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data. As a result, Plaintiff's and Class Members' PII was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.    PARTIES

12.    Plaintiff Alexander Buck is a citizen of Kansas residing in Valley Center. Mr. Buck purchased items from a website operated by WMG on or about June 7, 2020. He used his pre-paid debit card for the purchases. He received WMG's *Notice of Data Breach*, dated September 3, 2020, on or about September 6, 2020.

13.    Defendant Warner Music Group Corp. is a Delaware corporation with its principal place of business in New York, New York. Therefore, WMG is a citizen of both Delaware and New York.

14.    All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III.    JURISDICTION AND VENUE

15.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, is a class action in which some members are citizens of states different than Defendant, and there are more than 100 members in the proposed class.

16.     This Court has personal jurisdiction over WMG because WMG purposefully availed itself of the privilege of conducting business in New York; because it transacts business and supplies goods in New York; and because many of the acts, claims, and omissions giving rise to this action occurred in New York. WMG is headquartered in this District and conducts substantial business in New York and in this District through its headquarters, offices, and affiliates, including through the promotion, sale, and distribution of its products through online advertising and marketing and business within New York.

17.     Venue is proper in this District under 28 U.S.C. §1391(b) because WMG is headquartered in this District and a substantial amount of the WMG's conduct harming Plaintiff and Class Members originated from this District.

## IV.     FACTUAL ALLEGATIONS

### a.  Warner Music Group

18.     WMG is an American multinational entertainment and record label conglomerate based in New York City. As one of the "big three" recording companies in the global music industry, WMG operates thousands of websites with e-commerce platforms. With a multibillion-dollar annual turnover, WMG represents over 60,000 artists, employs more than 3,500 people, and has operations in more than 50 countries. WMG owns and operates some of the largest and most

successful labels in the world, including Atlantic Records, Elektra Records, Warner Records, and Parlophone.

19.     Formerly part of Time Warner, WMG was publicly traded on the New York Stock Exchange until 2011 when it announced its privatization and sale to Access Industries. Earlier this year, WMG had its second IPO on Nasdaq, once again becoming a public company.

20.     Plaintiff and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Customers demand security to safeguard their PII.

21.     WMG had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties. WMG touts the secure nature of its websites in its various Privacy Policies, including the one provided by Atlantic Records: "We will use reasonable physical, technical and administrative measures to protect Personal Information under our control." WMG also states: "We want to emphasize at the outset that keeping personal information safe and secure is very important to us."[1]

22.     WMG does not claim that it abides by the PCI DSS (Payment Card Industry Data Security Standard) compliance. The Payment Card Industry Data Security Standard ("PCI DSS") is a list of twelve information security requirements that were promulgated by the Payment Card Industry Security Standards Council. The PCI DSS list applies to all organizations and environments where cardholder data is stored, processed, or transmitted, and requires companies selling products online, like WMG, to protect cardholder data, ensure the maintenance of

---

[1] *Notice of Data Breach*, a true and correct copy of which is attached hereto as Exhibit 1 ("Ex. 1").

vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies.

23.     The twelve requirements of the PCI DSS are:

a) Install and maintain a firewall configuration to protect cardholder data;
b) Do not use vendor-supplied defaults for system passwords and other security parameters;
c) Protect stored cardholder data;
d) Encrypt transmission of cardholder data across open, public networks;
e) Protect all systems against malware and regularly update anti-virus software or programs;
f) Develop and maintain secure systems and applications;
g) Restrict access to cardholder data by business need to know;
h) Identify and authenticate access to system components;
i) Restrict physical access to cardholder data;
j) Track and monitor all access to network resources and cardholder data;
k) Regularly test security systems and processes; and
l) Maintain a policy that addresses information security for all personnel.[2]

24.     Furthermore, PCI DSS sets forth detailed and comprehensive requirements that must be followed to meet each of the twelve mandates.

25.     WMG was always fully aware of its data protection obligations in light of its participation in its online payment card processing system's collection and transmission of thousands of sets of PII.

26.     To purchase items on WMG's websites, customers can either create an account or check out as a guest. Either choice requires, at a minimum, that the customer enter the following PII onto the website:

- Full name;
- billing address;
- shipping address;
- email address;
- telephone number;

---

[2] Payment Card International (PCI) Data Security Standard, "Requirements and Security Assessment Procedures, Version 3.2.1," (May 2018), https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2-1.pdf?agreement=true&time=1574069601944.

- name on the payment card;
- type of payment card;
- full payment card number;
- payment card expiration date; and
- security code, or CVV code (card verification number).

27.     When a customer purchases items on WMG's websites, as a guest or through an account, when they enter their PII at the initial sign-up screen they are not asked to acknowledge a "Privacy Policy," and they are not asked to read the "Terms of Use." There is only a statement in uniform font that reads: "By placing this order, you agree to our Terms, Conditions and Cancellation Policy." Links to WMG's "Privacy Policy" and "Terms of Use" are included on the extreme bottom right borders of the website pages in unremarkable font, with no indications of hyperlinks to the policies or terms. The "Privacy Policy" and "Terms of Use," however, do not appear at all on the mobile webpage unless the user clicks on another link. Similarly, there are no links to the "Terms of Use" on the e-commerce platform where the purchase is finalized.

28.     Because WMG accepted payment cards containing sensitive financial information, it knew that its customers were entitled to and did in fact rely on it to keep that sensitive information secure from would-be data thieves in accordance with the PCI DSS requirements.

29.     WMG's violations of the PCI DSS requirements are highlighted herein.

   **b.  The Data Breach**

30.     Beginning on or about September 3, 2020, WMG sent customers a *Notice of Data Breach*[3] in which WMG informed the recipients of the following:

   **WHAT HAPPENED?**
   On August 5, 2020, we learned that an unauthorized third party had compromised a number  of US-based e-commerce websites WMG operates but that are hosted and supported by an  external service provider. This allowed the unauthorized third party to potentially acquire  a copy of the personal information you entered into one or more of the affected website(s)  between April 25, 2020 and August 5, 2020.

---

[3] *Notice of Data Breach*, a true and correct copy of which is attached hereto as Exhibit 1 ("Ex. 1").

**WHAT INFORMATION WAS INVOLVED?**
Any personal information you entered into one or more of the affected website(s) between April 25, 2020 and August 5, 2020 after placing an item in your shopping cart was potentially acquired by the unauthorized third party. This could have included your name, email address, telephone number, billing address, shipping address, and payment card details (card number, CVC/CVV and expiration date).

31.    On or about September 2, 2020, WMG sent letters detailing the Data Breach to various state Attorneys General. In that letter, WMG confirmed the information in the *Notice of Data Breach*, but added that the unauthorized third party that "compromised" WMG's e-commerce websites "acquired a copy of information customers entered on the affected websites after [the customers] plac[ed] an item into their shopping carts."[4]

32.    WMG admits it did not detect the Data Breach for more than three months. WMG's customers' PII was scraped by hackers and made available to other criminals and, upon information and belief, may still be available for sale to criminals on the dark web. Even though WMG promised consumers it uses "reasonable physical, technical and administrative measures to protect Personal Information under our control," unauthorized individuals accessed WMG's customers' PII.

33.    In response to the Data Breach, WMG claims it "took steps to address and correct the issue. We also notified the relevant credit card providers as well as law enforcement[.]" WMG is also offering affected customers one year of "identity monitoring services," but there is no offer of identity theft insurance.

34.    WMG failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for current and former customers, resulting in the exposure of Plaintiff's and Class Members' PII.

---

[4] *See, for example, Letter to Iowa's Consumer Protection Division, Office of the Attorney General*, Sept. 2, 2020, *available at*: https://www.iowaattorneygeneral.gov/media/cms/922020_Warner_Music_Group_74089CCFA8DE1.pdf (last accessed Sept. 10, 2020).

### c.  WMG Failed to Adequately Protect Its Customers' PII

35.    Magecart is a loose affiliation of hacker groups responsible for skimming payment card attacks on various companies, including British Airways and Ticketmaster.[5] Typically, these hackers insert virtual credit card skimmers or scrapers (also known as *form jacking*) into a web application (usually the shopping cart), and proceed to scrape payment card information to sell on the dark web.[6] Such attacks exploit weaknesses in the code of the e-commerce platform, without necessarily comprising the victim website's network or server.[7]

36.    Magecart and these scraping breaches are not new: RiskIQ's earliest Magecart observation occurred on August 8, 2010, and only continued to proliferate over the last decade.[8] Thus, WMG would have been made aware of this type of breach since that time, especially considering the surge of these types of breaches in the last few years.

37.    It is well known that the sensitive PII at issue here is valuable and frequently targeted by hackers. In a recent article, Business Insider noted that "[d]ata breaches are on the rise for all kinds of businesses ... At least 11 consumer companies reported data breaches in the last year. Many of them were caused by flaws in payment systems either online or in stores."[9]

38.    Ensighten, a global cybersecurity leader providing client-side protection against data loss, ad injection and intrusion, explains the recent surge in website skimming and data theft as follows:

> [D]ue to the move to more secure chip-based card infrastructure, it is

---

[5] *Magecart Hits 80 Major eCommerce Sites in Card-Skimming Bonanza*, Threatpost, Aug. 28, 2019, *available at:* https://threatpost.com/magecart-ecommerce-card-skimming-bonanza/147765/ (last accessed Oct. 15, 2020).
[6] *Id.*
[7] *What is Magecart and was it behind the Ticketmaster and BA hacks?*, Computerworld, Sep. 18, 2018, *available at:* https://www.idgconnect.com/idgconnect/news/1029449/magecart-ticketmaster-hacks (last accessed Oct. 15, 2020).
[8] *Magecart: New Research Shows the State of a Growing Threat*, RiskIQ, Oct. 4, 2019, *available at:* https://www.riskiq.com/blog/external-threat-management/magecart-growing-threat/ (last accessed Oct. 15, 2020).
[9] Dennis Green & Mary Hanbury, "If you bought anything from these 11 companies in the last year, your data may have been stolen," BUSINESS INSIDER (Aug. 15, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

becoming more expensive for thieves to fabricate and successfully use stolen customer data. As such, criminals are now turning their attention to website skimming, with ecommerce website attacks described as "off the charts" over the past year. A Symantec report shows that an average of 4,800 websites are compromised … each month.[10]

39.     Despite the known risk of a data breach and the widespread publicity and industry alerts regarding the other notable data breaches, WMG failed to take reasonable steps to adequately protect its systems from being breached, and then failed to detect the Data Breach for months.

40.     WMG could have prevented this Data Breach by properly encrypting the PII or appropriately and adequately monitoring the e-commerce platforms for malicious codes. The code in this case was in place for over three months. WMG's negligence in safeguarding its customers' PII is exacerbated by the repeated warnings and alerts directed to protecting and securing e-commerce platforms across the country and to corporations alike. And WMG, specifically, has suffered similar breaches as recently as 2017.[11]

41.     WMG has acknowledged the sensitive and confidential nature of the PII. Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own acknowledgments of data security compromises, and despite acknowledgment of its duties to keep PII private and secure, WMG failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

42.     Additionally, according to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the

---

[10] *See* https://www.ensighten.com/blog/how-an-online-skimming-attack-unfolds (last accessed Oct. 15, 2020).
[11] *Lax Security Exposes 4 Million Warner Bros Customers' Data*, Identiy Theft Resource Center, *available at*: https://www.idtheftcenter.org/lax-security-exposes-4-million-warner-bros-customers-data/ (last accessed Oct. 15, 2020).

Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45. *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245-47 (3d Cir. 2015); *In re BJ's Wholesale Club, LLC*, 140 F.T.C. 465 (2005).

43.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

44.     The FTC has also published a document, entitled "Protecting Personal Information: A Guide for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[12]

45.     As noted above, WMG should have been aware of the need to have adequate, updated data security systems in place but failed to update and maintain its data security systems in a meaningful way so as to prevent data breaches. WMG's security flaws run afoul of industry best practices and standards. More specifically, the security practices in place at WMG are in stark contrast and in direct conflict with the PCI DSS core security standards.

---

[12]FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited November 8, 2019).

46.     Had WMG maintained its information technology systems ("IT systems"), adequately protected them, and had adequate security safeguards in place, it could have prevented the Data Breach.

47.     With the industry warnings, awareness of industry best practices, the PCI DSS, and numerous well-documented restaurant, retail, and e-commerce data breaches, there is no doubt WMG was alerted to the risk associated with failing to ensure that its IT systems were adequately secured. WMG was not only aware of the threat of data breaches, generally, but was aware of the specific danger of malware infiltration. Malware has been used recently to infiltrate large retailers such as, *inter alia*, Target, GameStop, Chipotle, Jason's Deli, Whole Foods, Sally Beauty, Neiman Marcus, Michaels Stores, and Supervalu. As a result, WMG was aware that malware is a real threat and is a primary tool of infiltration used by hackers.

48.     Despite the fact that WMG was on notice of the very real possibility of consumer data theft associated with its security practices and that WMG knew or should have known about the elementary infirmities associated with its security systems, it still failed to make necessary changes to its security practices and protocols, and permitted massive malware intrusions to occur for months without notifying Plaintiff and Class members.

49.     WMG, at all times relevant to this action, had a duty to Plaintiff and Class Members to: (a) properly secure PII submitted to or collected on WMG's website; (b) encrypt PII using industry standard methods; (c) use available technology to defend its system from well-known methods of invasion; (d) act reasonably to prevent the foreseeable harms to Plaintiff and the Class that would naturally result from the theft of their PII; and (e) promptly notify customers when WMG became aware of the potential that customers' PII would be compromised.

50.     Defendant failed in all the aforementioned obligations.  Instead, WMG permitted

13

customers' PII to be compromised by failing to take reasonable steps against an obvious threat.

51.      In addition, leading up to the Data Breach, and during the Breach itself and the investigation that followed, WMG failed to follow the guidelines set forth by the FTC.

52.      Industry experts are clear that a data breach is indicative of data security failures. Indeed, Julie Conroy—research director at the research and advisory firm Aite Group—has identified that, "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[13]

53.      Clearly, had WMG utilized adequate data security and data breach precautions and response protocols, the window of the Data Breach would have been significantly mitigated, and the level of impact could have been reduced (or not permitted to happen in the first place).

### d.  Value of Personal Identifiable Information

54.      Due to Defendant's inadequate security and failure to remediate the problem in a timely manner, WMG customers' PII, upon information and belief, is now in the hands of cybercriminals who can quickly turn a profit by posting this PII on the dark web. As one data security commentator noted in response to an unrelated data breach:

> . . . *2 million cards on sale on the dark web would indicate this was a very successful project for the cybercriminals involved, and one which is likely to be incredibly profitable*. . . .[14]

55.      The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200,

---

[13]Lisa Baertlein, "Chipotle Says Hackers Hit Most Restaurants in Data Breach," REUTERS (May 26, 2017), http://www.reuters.com/article/us-chipotle-cyber-idUSKBN18M2BY.

[14]"Cyber Attack on Earl Enterprises (Planet Hollywood)," is Buzznews (Apr. 1, 2019), https://www.informationsecuritybuzz.com/expert-comments/cyber-attack-on-earl-enterprises- planet-hollywood/.

and bank details have a price range of $50 to $200.[15] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[16]

56.     At all relevant times, WMG knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequence that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

57.     WMG was, or should have been, fully aware of the significant volume of daily payment card transactions on its websites. The malware infected WMG's e-commerce platforms where customers could purchase or reserve certain products only available through Defendant's websites, amounting to potentially millions of payment card transactions exposed to malicious actors.

58.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. The following excerpt is from a study by the U.S. Government Accountability Office ("GAO") regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

---

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Oct. 15, 2020).

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Oct. 15, 2020).

[17] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last visited Sept. 9, 2020).

59.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

60.     To date, WMG has offered its customers only one year of credit monitoring service, with no identity theft insurance. The offered service is inadequate to protect Plaintiff and Class Members from the threats they face for years to come.

61.     The injuries to Plaintiff and Class Members were directly and proximately caused by WMG's failure to implement or maintain reasonable, adequate data security measures for its customers' PII.

**e.  Plaintiff Buck' Experience**

62.     Plaintiff Alexander Buck accessed and made a purchase on one of Defendant's websites (dead.net) on or about June 7, 2020 using his pre-paid debit card.

63.     Mr. Buck made this purchase through a website operated by WMG. He entered his PII into WMG's e-commerce payment platform, including his full name, billing and shipping addresses, payment card types and full numbers, CVV codes, payment card expiration dates, email address, and telephone number.

64.     Mr. Buck received the *Notice of Data Breach* dated September 3, 2020 on or about September 6, 2020.

65.     Since his June 2020 transaction, unknown third parties used Mr. Buck's payment card – the same pre-paid debit card he used on WMG's hacked e-commerce platform – to make a number of unauthorized purchases via the internet. The fraudulent purchases, which appear to be international transactions, totaled $2,253.61.

66.    Mr. Buck has only been reimbursed for $2,048.36 of the unauthorized charges, leaving him with $205.25 still unreimbursed. As such, the losses experienced by Mr. Buck deprived him of the total $2,253.61 deficit and continue to deprive him of the remaining $205.25 which has yet to be reimbursed.

67.    As a result of the Data Breach and the theft of his funds, Mr. Buck has already spent six hours dealing with the consequences of the Data Breach, which includes time spent confirming that he made purchases using his payment card during the relevant time period, vigilantly reviewing his accounts, including the account compromised in the Data Breach, contacting his financial institution, self-monitoring his accounts, placing credit freezes, and exploring credit monitoring and identity theft insurance options.

68.    Mr. Buck is not aware of any other data breaches that could have resulted in the theft of his payment card information.

69.    Mr. Buck stores any and all documents containing his PII in a safe and secure digital location, and destroys any documents he receives in the mail that contain his PII, or that may contain any information that could otherwise be used to compromise his payment card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

70.    Mr. Buck suffered actual injury and damages in an amount totaling at least $2,253.61 from his pre-paid debit card account, and in paying money to, and purchasing products from, WMG's websites during the Data Breach – expenditures he would not have made had WMG disclosed that it lacked computer systems and data security practices adequate to safeguard customers' PII from theft.

71.     Mr. Buck has also suffered actual injury in the form of damages to and diminution in the value of his PII – a form of intangible property that he entrusted to WMG for the purpose of purchasing WMG's products and which was compromised in and as a result of the Data Breach.

72.     Mr. Buck suffered lost money, time, annoyance, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy.

73.     Mr. Buck has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in WMG's possession, is protected and safeguarded from future breaches.

74.     Mr. Buck has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

## V.    CLASS ALLEGATIONS

75.     Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

76.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

>   All individuals whose PII was compromised in the data breach first announced by Warner Music Group on or about September 3, 2020 (the "Nationwide Class").

77.     Excluded from the Class are Defendant  and Defendant's parents, subsidiaries, affiliates, officers and directors, current or former  employees, and any entity in which Defendant has a controlling interest; all individuals who make   a timely election to be excluded from this proceeding using the correct protocol for opting out; and  all judges assigned to hear any aspect of this litigation, as well as their staff and immediate family members.

78.     Plaintiff reserves the right to modify, change, or expand the definition of the Nationwide Class, or to propose subclasses based on discovery and further investigation.

79.     **Numerosity:** While the precise number of Class Members has not yet been determined, Class Members are so numerous that their individual joinder is impracticable. Upon information and belief, Defendant has records sufficient to determine and identify those customers who comprise the Class.

80.     **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to Plaintiff and the Class Members. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

> a)   Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;
>
> b)   Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
>
> c)   Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;
>
> d)   Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;
>
> e)   Whether and when Defendant actually learned of the Data Breach;
>
> f)   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;
>
> g)   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h)  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i)  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j)  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k)  Whether Plaintiff and Class Members are entitled to statutory damages, compensatory damages, consequential damages, nominal damages, and/or punitive damages as a result of Defendant's wrongful conduct;

l)  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m)  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

81.  Policies Generally Applicable to the Class: This action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

82.    <u>Adequacy</u>: Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class he seeks to represent; Plaintiff has retained counsel that is competent and highly experienced in class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

83.    <u>Typicality</u>: Plaintiff's claims are typical of those of other Class Members. Plaintiff and all Class Members were injured through WMG's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class Member because Plaintiff and each Class Member had their PII compromised in the same way by the same actions and omissions by WMG.

84.    <u>Superiority</u>: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for Class Members to individually and effectively redress WMG's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

85.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

86.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action. Additionally, adequate notice can be given to Class Members directly using information maintained in Defendant's records.

87.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth herein.

88.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

89.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)   Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b)   Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c)   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d)   Whether Defendant adequately, and accurately informed Plaintiff and Class Members that their PII had been compromised;

e)   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f)   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members; and

g)   Whether Class Members are entitled to statutory damages, compensatory damages, consequential damages, nominal damages, injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## COUNT I
### Negligence
**(On Behalf of Plaintiff and the Nationwide Class)**

90.   Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

91.    As a condition of their using the services of Defendant, customers were obligated to provide Defendant with their PII, including payment card information.

92.    Plaintiff and the Class Members entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

93.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

94.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of its customers' PII involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party.

95.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiff's and Class Members' PII in Defendant's possession as adequately secured and protected.

96.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class Members' PII.

97.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices and previous breach incidents involving its customers' PII.

98.    Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of should have known of the

inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

99.     Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiff's and Class Members' PII.

100.    Plaintiff and the Class Members had no ability to protect their PII that was in, and upon information and belief remains in, Defendant's possession.

101.    Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

102.    Defendant had and continues to have a duty to adequately disclose the details of the Data Breach sufficient to allow Plaintiff and the Class Members to take steps to prevent, mitigate, and repair any identity theft, financial fraud, and the fraudulent use of their PII by third parties.

103.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and Class Members.

104.    Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

105.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and Class Members during the time the PII was within Defendant's possession or control.

25

106.     Defendant improperly and inadequately safeguarded the PII of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

107.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect customers' PII in the face of increased risk of theft and, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its customers' PII.

108.     Defendant also breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

109.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

110.     There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and the Class. Plaintiff's and Class Members' PII was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

111.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, financial fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not

limited to efforts spent researching how to prevent, detect, contest, and recover from financial crimes and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers in its continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminished value of Defendant's goods and services they received.

112.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

### COUNT II
### Invasion of Privacy
### (On Behalf of Plaintiff and the Nationwide Class)

113.    Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

114.    Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

115.    Defendant owed a duty to its customers, including Plaintiff and Class Members, to keep their PII contained as a part thereof, confidential.

116.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiff and Class Members.

117.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiff and Class Members, by way of Defendant's failure to protect the PII.

118.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and Class Members is highly offensive to a reasonable person.

119.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their PII to Defendant as part of its use of Defendant's services, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

120.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

121.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

122.    Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

123.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and Class Members was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer damages.

124.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

## COUNT III
### Negligence Per Se
### (On Behalf of Plaintiff and the Nationwide Class)

125.    Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

126.    Pursuant to the FTC Act, 15 U.S.C. § 45, WMG had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' personal information.

127.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as WMG, of failing to use reasonable measures to protect PII, including payment information. The FTC publications and orders described above also form part of the basis of WMG's duty to protect Plaintiff's and Class Members' sensitive information.

128.    WMG violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with applicable industry standards,

including PCI DSS, as described in detail herein. WMG's conduct was particularly unreasonable given the nature and amount of PII it collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to consumers and financial institutions.

129.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

130.    WMG had a duty to Plaintiff and Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' personal information.

131.    WMG breached its duties to Plaintiff and Class Members under the FTC Act (and similar state statutes), by failing to provide fair, reasonable, or adequate website and data security practices to safeguard Plaintiff's and Class Members' financial and personal information.

132.    WMG's violation of Section 5 of the FTC Act (and similar state statutes) and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

133.    But for WMG's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, they would not have been injured.

134.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of WMG's breach of its duties. WMG knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harms associated with the exposure of their PII.

135.    Had Plaintiff and Class Members known that WMG did and does not adequately protect customer PII, and that WMG's website was compromised during the months they made their purchases, they would not have made the purchases.

136.    As a direct and proximate result of WMG's negligence *per se*, Plaintiff and Class Members have suffered harm, including but not limited to, loss of time and money responding to the Data Breach, including resolving fraudulent charges, obtaining protection against future identity theft, and otherwise mitigating the harms caused by the Breach; financial losses related to the purchases made at WMG that Plaintiff and Class Members would not have made had they known of the Data Breach and WMG's careless approach to cyber security and responding to the Breach; lost control over the value of personal information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

<u>**COUNT IV**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

137.    Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

138.    Plaintiff and Class Members who made purchases on the WMG websites during the period in which the Data Breach occurred had implied contracts with WMG.

139.    Specifically, Plaintiff and Class Members paid money to WMG and, in connection with those transactions, provided WMG with their PII, including payment and payment information. In exchange, WMG agreed, among other things: (i) to provide the purchased product(s); (ii) to take reasonable measures to protect the security and confidentiality of Plaintiff's

and Class Members' PII; and (iii) to protect Plaintiff's and Class Members' personal information in compliance with federal and state laws and regulations and industry standards.

140.    Protection of personal information is a material term of the implied contracts between Plaintiff and Class Members and WMG. Indeed, as described above, WMG recognized the importance of data security and privacy of customers' sensitive financial information. Had Plaintiff and Class Members known that WMG would not adequately protect their PII, or that WMG's website was breached, they would not have made purchases on the WMG website.

141.    WMG did not satisfy these agreements and obligations to Plaintiff and Class Members under the implied contracts because it did not take reasonable measures to keep their personal information secure and confidential, and because it did not comply with applicable laws, regulations, and industry standards.

142.    WMG materially breached its implied contracts with Plaintiff and Class Members by failing to implement adequate PII security measures.

143.    Plaintiff and Class Members fully performed their obligations under their implied contracts with WMG.

144.    WMG's failure to satisfy its obligations led directly to the successful intrusion of WMG's website and to the unauthorized parties' access and exfiltration of Plaintiff's and Class Members' PII.

145.    WMG breached these implied contracts as a result of its failure to implement security measures adequate to protect Plaintiff's and Class Members' PII.

146.    Also, as a result of WMG's failure to implement proper security measures, Plaintiff and Class Members suffered actual damages resulting from the compromise of their personal

information and remain at an imminent and substantial risk of suffering additional damages in the future.

147.    Accordingly, Plaintiff and Class Members have been injured as a proximate result of WMG's breach of implied contracts and are entitled to damages and/or restitution in an amount to be determined at trial.

### COUNT V
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

148.     Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

149.    This claim is pleaded in the alternative to the above breach of implied contract claim.

150.    Plaintiff and Class Members conferred a monetary benefit upon Defendant. Specifically, they purchased goods and services from Defendant and provided Defendant with their PII. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and should have been entitled to have Defendant protect their PII with adequate data security.

151.    Defendant had knowledge of the benefits conferred upon them by Plaintiff and the Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' PII, as this was utilized by Defendant to facilitate payment to it.

152.    The amounts Plaintiff and Class Members paid for Defendant's goods and services should have been used, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures, including the proper and safe disposal of Plaintiff' and Class Members' PII.

153.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement (or adequately implement) the data management and security measures that are mandated by industry standards.

154.    Defendant failed to secure the PII of Plaintiff and Class Members and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

155.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

156.    If Plaintiff and Class Members knew that Defendant would not secure their PII using adequate security, they would not have made purchases or developed a financial relationship with Defendant.

157.    Plaintiff and Class Members have no adequate remedy at law.

158.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, financial crimes, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from financial crimes and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers

and former customers in its continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminished value of Defendant's goods and services they received.

159.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

160.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from Plaintiff and Class Members. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's goods and services.

## COUNT VI
### Violations of New York Consumer Law for Deceptive Acts and Practices
### New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the Nationwide Class)

161.    Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

162.    New York General Business Law ("NYGBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

163.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 349, and the deception occurred within New York State.

164.    Defendant stored Plaintiff's and the Class members' PII in Defendant's electronic and consumer information databases. Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied "with federal regulations" and that would have kept Plaintiff's and the Class members' PII secure and prevented the loss or misuse of Plaintiff's and the Class members' PII. Defendant did not disclose to Plaintiff and the Class members that its data systems were not secure.

165.    Plaintiff and the Class never would have provided their sensitive and personal PII if they had been told or knew that Defendant failed to maintain sufficient security to keep such PII from being hacked and taken by others, and that Defendant failed to maintain the information in encrypted form.

166.    Defendant violated the NYGBL §349 by misrepresenting, both by affirmative conduct and by omission, the safety of Defendant's many systems and services, specifically the security thereof, and its ability to safely store Plaintiff' and the Class members' PII.

167.    Defendant also violated NYGBL §349 by failing to implement reasonable and appropriate security measures or follow industry standards for data security, and by failing to immediately notify Plaintiff and the Class members of the Data Breach. If Defendant had complied with these legal requirements, Plaintiff and the other Class members would not have suffered the damages related to the Data Breach.

168.    Plaintiff and the Class Members were entitled to assume, and did assume, Defendant would take appropriate measures to keep their PII safe. Defendant did not disclose at any time that Plaintiff's and the Class' PII was vulnerable to hackers because Defendant's data security measures were inadequate, and Defendant was the only one in possession of that material information, which it had a duty to disclose.

169.    The aforementioned conduct is and was deceptive, false, and fraudulent and constitutes an unconscionable commercial practice in that Defendant has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the defective security system it maintained and failed to reveal the Data Breach timely and adequately.

170.    Members of the public were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

171.    Such acts by Defendant are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer providing his or her PII to Defendant. Said deceptive acts and practices are material. The requests for and use of such PII in New York through deceptive means occurring in New York were consumer-oriented acts and thereby falls under the New York consumer fraud statute, NYGBL § 349.

172.    Defendant's wrongful conduct caused Plaintiff and the Class to suffer a consumer-related injury by causing them to incur substantial expense to protect from misuse of the PII by third parties and placing the Plaintiff and the Class at serious risk for monetary damages.

173.    As a direct and proximate result of Defendant's violations of the above, Plaintiff and Class members suffered damages as referred to throughout this Class Action Complaint.

174.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the Class seek statutory damages for each injury and violation which has occurred.

### COUNT VII
### Declaratory Relief
### (On Behalf of Plaintiff and the Nationwide Class)

175.    Plaintiff realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 74.

176.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C.

§ 2201.

177.    As previously alleged and pleaded, Defendant owes duties of care to Plaintiff and Class Members that require it to adequately secure their PII.

178.    Defendant still possesses the PII of Plaintiff and Class Members.

179.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and Class Members.

180.    Upon information and belief, Defendant is only taking minimal steps to increase its data security but there is nothing to prevent Defendant from reversing these changes once it has weathered the increased public attention resulting from this Data Breach, and to once again place profits above protection.

181.    Plaintiff and Class Members therefore seek a declaration that (1) Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

    a)  Ordering Defendant to engage third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    b)  Ordering Defendant to significantly increase its spending on cybersecurity, including website, systems and personnel;

    c)  Ordering Defendant to engage third-party security auditors and internal

38

personnel to run automated security monitoring;

d) Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

e) Ordering that Defendant conduct regular database and website scanning and securing checks;

f) Ordering Defendant to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

g) Ordering Defendant to implement and enforce adequate retention policies for PII, including destroying PII as soon as it is no longer necessary for it to be retained.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and all Class Members, requests judgment against the Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class as defined herein, and appointing  Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to the Plaintiff and Class Members;

C.    For equitable relief compelling Defendant to use appropriate cyber security methods and policies with respect to PII collection, storage, protection, and disposal, and to disclose with specificity to Plaintiff and Class Members the type

39

of PII compromised;

D.    For an award of damages, including compensatory, nominal, and

consequential  damages, as allowed by law in an amount to be determined;

E.    For an award of punitive damages;

F.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    For prejudgment interest on all amounts awarded; and

H.    Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated: October 29, 2020                    Respectfully Submitted,


                                           **WEISSLAW LLP**

                                    By     _____
                                           Richard A. Acocelli
                                           1500 Broadway, 16th Floor
                                           New York, New York 10036
                                           Telephone: (212) 682-3025
                                           Facsimile: (212) 682-3010
                                           Email: racocelli@weisslawllp.com

                                           *Attorneys for Plaintiff*